UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

                Plaintiff,

     vs.                  Case No. 18-CR-146-JDP-1

PETER JEWELL-REIGEL,       Madison, Wisconsin
                      March 7, 2019
            Defendant.   2:00 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF SENTENCING HEARING
HELD BEFORE CHIEF JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:
        Office of the United States Attorney
        BY:  ELIZABETH ALTMAN
        Assistant United States Attorney
        222 West Washington Avenue, Suite 700
        Madison, Wisconsin  53703

For the Defendant:
        Federal Defender Services of Wisconsin, Inc.
        BY:  JOSEPH A. BUGNI
        Madison Branch Office
        22 East Mifflin Street, Suite 1000
        Madison, Wisconsin  53703

Also Present:
        Peter Jewell-Reigel, Defendant
        Richard Williams, U.S. Probation Officer

CHERYL A. SEEMAN, RMR, CRR
Official Court Reporter
United States District Court
120 North Henry Street, Room 410
Madison, Wisconsin  53703
1-608-261-5708

1          (Called to order 2 p.m.)

2               THE CLERK:  Case No. 18-CR-146-JDP-1, *United*

3    *States of America v. Peter Jewell-Reigel*.  Court is called

4    for sentencing.  May we have the appearances, please?

5               MS. ALTMAN:  Good afternoon, Your Honor.  United

6    States appears by Elizabeth Altman.

7               THE COURT:  Good afternoon.

8               MR. BUGNI:  Good afternoon, Your Honor.  Joe

9    Bugni appearing on.

10        Behalf of Peter Jewell-Reigel.

11              THE COURT:  Mr. Jewell-Reigel, Mr. Bugni, good

12   afternoon to you.  Rich Williams is the probation officer

13   who prepared the presentence report and he's in the

14   courtroom with us here today.  Let me review the materials

15   that I have reviewed in connection with the sentencing to

16   make sure I didn't miss anything.

17        I've got the presentence report, statement from the

18   government that there were no objections to the

19   presentence report.  I have some clarifications from the

20   defendant, no objections that affected the guideline,

21   anyway.  Then I've got an addendum and a revised

22   presentence report, a sentencing memorandum from both

23   sides.  And then the defendant's sentencing memorandum

24   kind of came in installments.  I have three submissions,

25   so three of those from you.  So that's what I have.

1    Did I miss anything from your side, Ms. Altman?

2        MS. ALTMAN:  Not from my side, Your Honor.

3        THE COURT:  Mr. Bugni?

4        MR. BUGNI:  No, Your Honor.

5        THE COURT:  I think I have everything.  All

6   right.  So do we have anybody that we're going to hear

7   from besides you, Ms. Altman?

8        MS. ALTMAN:  No.

9        THE COURT:  Witnesses have been notified, but

10  they're not here?

11       MS. ALTMAN:  Correct.

12       THE COURT:  All right.  And, Mr. Bugni, I'll hear

13  from you and Mr. Jewell-Reigel, I suppose?

14       MR. BUGNI:  That's correct, Your Honor.

15       THE COURT:  Nobody else?

16       MR. BUGNI:  No, Your Honor.

17       THE COURT:  All right.  So, Mr. Jewell-Reigel, I

18  need to make sure that you've read the presentence report

19  and the revised presentence report and the addendum and

20  that you discussed all those documents with your lawyer.

21  Have you done that?

22       THE DEFENDANT:  Yes, sir.

23       THE COURT:  You can pull the microphone over a

24  little closer to you so you don't have to lean into it, so

25  just keep it close to you.  That's good.  So you've read

1  it --

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  -- and talked about it with your

4  lawyer.  Do you have any other concerns with the

5  presentence report?

6          THE DEFENDANT:  No, Your Honor.

7          THE COURT:  All your concerns have been conveyed

8  to me?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  And, Mr. Bugni, have the

11  clarifications that you offered been adequately reflected

12  in the revised presentence report?

13          MR. BUGNI:  They have, Your Honor.

14          THE COURT:  Okay.  I'll adopt the facts in the

15  presentence report as the facts on which I'll base my

16  sentence and I will accept the plea agreement.  I think

17  that the offense of conviction adequately reflects the

18  defendant's criminal conduct.  The plea agreement does not

19  undermine the statutory purposes of sentencing.  And I

20  will take into consideration both the advisory sentencing

21  guidelines and the statutory purposes of sentencing that

22  are set out in Title 18 of the United States Code at

23  Section 3553(a).

24      Let me just make a record of where we've landed with

25  the guidelines.  Nobody has objected to them, but let's

1    make that clear.  I find that they're correctly calculated

2    in the guidelines.

3        So I've got a stipulation that although the defendant

4    pleaded guilty to the receipt-of-pornography charge, he

5    stipulated that his conduct involved the production of

6    child pornography, which is a violation of Title 18,

7    United States Code, Section 2251, so the guidelines are

8    calculated as though that were the offense.  So the base

9    offense level is 32 for that offense.

10       The Known Victim No. 1 was 12 years old when the

11   defendant exchanged pictures with her, so that is also a

12   two-level increase.  We've got the two-level increase and

13   that two-level increase for the age of the victim is in

14   guideline section 2G2.1(b)(1)(B).  Then we've got the use

15   of an interactive computer service which produces a

16   two-level increase as a result of guideline section

17   2G2.1(b)(6)(B)(i).  There aren't any other Chapter Two

18   adjustments.

19       We've got what I believe will be three levels of

20   downward adjustment for acceptance of responsibility

21   because we've got the defendant accepting responsibility

22   by entering a timely plea.  And I think the government is

23   prepared to move for the third level, but let's confirm

24   that.

25            MS. ALTMAN:  Yes, Your Honor.

1          THE COURT:  That gives us three levels of

2    downward adjustment.  Criminal history category is III, so

3    that gives the defendant an advisory guideline

4    imprisonment range of 168 to 210 months.

5          I'll stick to my usual practice here and that is that

6    I will depart downward by two levels because the use of

7    the interactive computer service is more or less a common

8    feature of virtually all pornography offenses these days

9    and so I think it exaggerates the culpability when the use

10   of the computer is so routine now and I will depart

11   downward two levels in light of that.

12         So that would give us an offense level of 31, which

13   would give us a guideline imprisonment range of 135 months

14   to 168 months.  So that's kind of what I will regard as a

15   starting point for our discussions based on the

16   guidelines.  That's what the guidelines tell us to do,

17   what they suggest we consider.

18         And I've got sentencing memos from both sides, so we

19   don't need to rehash everything, but we've got the

20   opportunity to provide me some further guidance as I

21   decide what sentence I should impose.

22         So, Ms. Altman.

23         MS. ALTMAN:  Thank you, Your Honor.  I will not

24   rehash anything in my sentencing memorandum.  But I do

25   want to indicate that to the extent there is incorrect

1    information in there, that certainly was not intentional.

2              THE COURT:  Well, I wouldn't think so, but let's

3    be clear about where the incorrect information is.  And I

4    gather the main focus from one of Mr. Bugni's submissions

5    is that the incident with the young lady in the closet,

6    that that person was really 15 years old and I think that

7    Mr. Jewell-Reigel was the same age?

8              MR. BUGNI:  15.  Yes, sir.

9              THE COURT:  They're both 15 at the time.

10             MS. ALTMAN:  Correct.  I was using the

11   information in paragraph 64 which indicated he was 16 and

12   then charged with repeated sexual assault of a child under

13   13.  That's the information I was using.

14             THE COURT:  So it is understandable confusion.

15   But I gather, now that we've got the fuller information,

16   they were both 15?

17             MS. ALTMAN:  Correct.

18             THE COURT:  Okay.

19             MS. ALTMAN:  I don't dispute that.

20             THE COURT:  Yeah.  And then the other aspects of

21   it, the two salient features of that paragraph 64, which

22   describes some very horrifying conduct, is that they were

23   both 15 and then also the charges were dismissed.

24        So Mr. Bugni makes reference to the discovery file in

25   that case, which I haven't seen, Mr. Williams hasn't seen.

1   But the bottom line seems to be a pretty plausible

2   conclusion that that isn't really what had happened or

3   they wouldn't have so readily dropped those charges.

4        MS. ALTMAN:  I don't know the answer to that,

5   Your Honor, and I don't know -- I think an equally -- I

6   don't know.  You could also say that although they were

7   both 15 and that the court decided that hitting someone

8   with a sex offense at 15 or the DA's office decided that

9   charging someone with a sex offense at 16 wasn't

10  necessary.  I don't know.  I didn't see the discovery

11  file.  I guess I would hate to speculate on what the

12  reasons were.  I don't have any reason to dispute

13  Mr. Bugni's characterization of it.  That's the best I can

14  answer to that.

15        THE COURT:  All right.

16        MS. ALTMAN:  Whatever it was, I don't know that

17  it -- well, it doesn't change my recommendation --

18        THE COURT:  Mm-mm.

19        MS. ALTMAN:  -- because he did still spend the

20  three days in jail for whatever the sexual conduct was.

21  And I think my basic point, other than the age, which of

22  course I was wrong, was that that was not part -- it

23  didn't deter him and it didn't keep him from then going on

24  to more egregious -- although still, I don't even want to

25  say, age appropriate -- more egregious behavior.  I mean,

1  his next offense, he was charged with second degree sexual

2  assault of a child.  That is more egregious conduct.

3      What I want to add in addition to my sentencing

4  memorandum is just a couple things.  In going through the

5  chats -- and I think, as Mr. Bugni indicated in his, there

6  was pages, and pages, and pages of chats -- but we noticed

7  that there was at least two 16-year-olds that he was

8  having contact with.  So it was not just a gaming forum

9  for him; he was also communicating with the two

10  16-year-olds.  We could determine that because he would

11  ask, people he was talking to, he would ask their age.  So

12  some of them we don't know how old they were, but we knew

13  there were at least two 16-year-olds.

14      One of the 16-year-old girls says in the chats that

15  she sent him pictures and gives him a phone number.

16  There's a message from one girl where they talk about

17  chatting on Kik and she says that he creeped her out.  One

18  of the girls says she emailed him videos and pictures.  He

19  asked for a, quote, "tit pic," unquote, and she says

20  "They're in the video."  He then asks her to write

21  something on her breasts and to show to -- quote, "show it

22  daddy," unquote.

23      So the behavior with the victim in this case, while

24  she was significantly younger than these two 16-year-olds,

25  certainly was not the only time that it happened while he

1   was doing this gaming activity.

2          THE COURT:  Okay.  Because there's the kind of, I

3   don't want to say, lead reference, but there's a very

4   summary reference in the paragraph 34 or thereabouts --

5   36: "This review also located nude pictures of other young

6   women.  Investigators weren't able to determine the ages

7   of the females in the other images."  And so --

8          MS. ALTMAN:  It may or may not have been those

9   girls.

10         THE COURT:  Okay.

11         MS. ALTMAN:  I can't say that it was.

12         THE COURT:  Okay.  But the texts demonstrate that

13  he was engaging in sexually oriented communication with at

14  least two 16-year-old girls?

15         MS. ALTMAN:  Yes.

16         THE COURT:  Okay.  All right.

17         MS. ALTMAN:  And then just I guess to conclude:

18  This is a tough case.  This was a tough case charging.

19  We -- without going into prosecutorial discretion, those

20  sort of things -- we struggled with how to charge it,

21  whether we charge it production, whether we charge it

22  receipt.  Of course a production would have had a 15-year

23  mandatory minimum.  No matter what happens, I think we

24  charged it correctly.

25         THE COURT:  I will -- it's not my job to decide

1    whether it was charged correctly, of course.  But I do

2    appreciate and I recognize that you could have charged

3    this far more aggressively, in which my hands would have

4    been tied and I would have had to impose a 15-year

5    mandatory minimum and so I appreciate that.  That has not

6    gone unnoticed by me.  I do appreciate that.

7        So you're not -- given the severity of the crime

8    here, and I think it is very serious, this isn't some

9    crazy draconian request that you're making.  I'm not

10   saying I'm persuaded or that I'm going to do it exactly,

11   but this is not an off-the-wall request.  I think this is

12   a very serious concern, so I appreciate that.  Is there

13   anything else?

14           MS. ALTMAN:  Just the end.

15           THE COURT:  Okay.

16           MS. ALTMAN:  The defense asks for five years.

17   Five years is the mandatory minimum.  Mandatory minimum is

18   for someone with no criminal history, for someone with no

19   aggravating factors, for someone maybe with mitigating

20   factors, and this is not that case.

21       In this case we have someone who has a history of

22   illegal, inappropriate conduct, some of it more peer

23   related, some of it -- it's all peer related, but some of

24   the girls were just too young.  They just, quite frankly,

25   were too young.

1    He has a criminal history.  He has more than one

2  victim, as demonstrated by the other chats or at least

3  attempting to perhaps leading in that way.  This isn't a

4  case for a mandatory minimum and that's my bottom line.

5          THE COURT:  Well, let me voice some of my

6  concerns here as I try to deal with what is a difficult

7  case.  The one obvious factor is that we've got a very

8  young offender here.  This is -- you know, he's a

9  20-year-old young man that is facing a long prison

10  sentence even at the mandatory minimum.  And so we're not

11  talking about a 40-year-old guy here; we're talking about

12  such a young offender, somebody who's never really been in

13  prison.  And so that's, you know, that's a strong factor

14  that militates against a long sentence.

15          MS. ALTMAN:  I don't disagree with that at all,

16  Your Honor.  But on the other hand, I would say if you

17  have a 40-year-old in here without a criminal history,

18  he's gone a whole lot longer without getting in trouble.

19  This man, at 20 --

20          THE COURT:  Yeah --

21          MS. ALTMAN:  -- has gotten in trouble numerous

22  times just by age 20.

23          THE COURT:  -- which brings me to the second

24  concern that I have and that is that I want to be really

25  fair and kind of dispassionate about assessing his

1   criminal history.  And so that's why I think the

2   clarification about the factual information in paragraph

3   64, which isn't part of the conviction, it's important to

4   get a sense of that.  That, of course, as I said, if that

5   were a conviction for a kidnapping and raping a

6   15-year-old, even if he was only 15 years old, that would

7   be a horse of a completely different color and so that

8   is -- that concerns me.

9       I guess the bottom line here is I'm worried about

10  whether his criminal history is being amplified as a

11  series of sex offenses for a lot of conduct that is

12  admittedly illegal for an 18-year-old to have sexual

13  contact with a 15-year-old.  But in the context of high

14  school, I think it probably happens much more often than

15  we are ready to acknowledge and that he's no saint here

16  because he's definitely noncompliant and dishonest.  And

17  so that aspect of his conduct during his high school age,

18  I recognize that and that concerns me.

19      But at the same time I think he's -- I'm not sure

20  it's really quite fair to describe him as a serial sex

21  offender.  It certainly isn't the prototypical set of

22  circumstances that we would expect from that.

23      So that's -- my concern here is that I not amplify

24  his sentence on the basis of sexual conduct which frankly

25  I think was probably charged and prosecuted in ways that

1    were more aggressive than the U.S. Attorney has done here.

2         MS. ALTMAN:  The only thing I can say in response

3    to that, Your Honor, is I think it is pretty prolific in

4    schools, as much as we want to say or not.

5         THE COURT:  Yeah.

6         MS. ALTMAN:  And the district attorney's office

7    in Marathon County must have had some reason to pursue

8    these charges.  I don't know what they are.

9         THE COURT:  Sometimes it's because the parents of

10   the girl are influential and angry.

11        MS. ALTMAN:  Sometimes.

12        THE COURT:  And, you know, then the young man

13   ends up getting tagged with something that the next time

14   he does something that's sort of typically stupid,

15   adolescent behavior then becomes worse and it spirals out

16   of control and I'm a little bit afraid that that's what's

17   happened to Mr. Jewell-Reigel here.

18        MS. ALTMAN:  The only response I would have to

19   that, Your Honor, is that -- well, a couple things.  I do

20   primarily these types of cases.  I don't see men this

21   young that often, but this is one of the -- maybe the only

22   man I've seen with this sort of history this young.  So is

23   it happening more often?  Maybe.

24        The other response I would say to that is it's three

25   different girls.  And so the idea that three different

1   sets of parents would have enough influence or clout or --

2   we see all the time parents don't care, quite frankly,

3   sadly, and we send out victim letters and we don't get

4   anything back.

5        I think we have to trust that Marathon County did the

6   right thing, just as we would like to think we would do

7   the right thing.  And rather than looking for reasons why

8   perhaps it wasn't right, I think we have to -- we should a

9   assume that it was.

10          THE COURT:  Mm-mm.  Okay.  And then what about

11   what is the status of KV No. 1?  I didn't really hear

12   anything from her.  Has she submitted any --

13          MS. ALTMAN:  She hasn't.  We've communicated and

14   sent notices to her family and we have not --

15          THE COURT:  Haven't heard anything back?

16          MS. ALTMAN:  No.

17          THE COURT:  So there's no request for restitution

18   or anything like that.  So restitution is not an issue and

19   I don't really have any input from her.

20          MS. ALTMAN:  No.

21          THE COURT:  All right.  Mr. Bugni, I read your

22   memo.  She voiced all the concerns that I have.  And I

23   want to be fair about Mr. Jewell-Reigel's criminal

24   history, but, you know, I'm not ready to just dismiss it

25   all as overzealous prosecution.  And best-case scenario,

1  Mr. Jewell-Reigel has shown himself to be, at least during

2  his high school years, kind of willing to lie, dishonest,

3  and he's really insistently noncompliant.  And so I think

4  you would acknowledge that.  Is that a fair amplifier of

5  his -- it's a fact of his criminal history that I think I

6  have to consider.

7             MR. BUGNI:  I agree.  I disagree with Ms. Altman

8  that five years is where you start.  I mean, I think you

9  start actually much lower, but you're like "Well, I'm

10  hemmed in by five years."  It's not that five years

11  somehow becomes like the bottom.

12             THE COURT:  Yeah.

13             MR. BUGNI:  It's just that you say "Well, if I

14  didn't have a mandatory minimum, I might say your first

15  time in prison, two or three years, that would be

16  appropriate, but now I have to move it to five."

17        As far as amplification goes, I agree there's three

18  different girls, so it doesn't become the overzealous

19  parents.  But when you really parse it, which I really

20  tried to embrace the bad facts in this case, Girl No. 1,

21  it's the story to get out of there.  They had text

22  messages from her.  They had, you know, interviews from

23  other people.  His parents were there at the house.

24             THE COURT:  Girl No. 1?

25             MR. BUGNI:  I'm sorry.  The 14-year-old -- the

1  15-year-old, the 15-year-old alleged kidnapping victim.

2          THE COURT:  Yes.  Okay.

3          MR. BUGNI:  So you take the first one, that's why

4  no charges are brought.  He spends three days in jail.

5  The truth comes out and it's belied by the facts.  Then

6  you go to the second girl, that I disagree.

7          THE COURT:  The second girl is?

8          MR. BUGNI:  The battery.

9          THE COURT:  EKH?

10         MR. BUGNI:  EKH.

11         THE COURT:  Yeah.

12         MR. BUGNI:  I disagree with Ms. Altman.  That is

13 poor prosecutorial discretion if the complaint is "We were

14 wrestling, he poked me in the belly, he walked on my back

15 and he shoved me between his brother and I," and then his

16 parents are there to witness it and say "She asked him to

17 give her a massage and walk on his back."  He's not that

18 big of guy.  If some girl asked me to do that, that would

19 be crazy.  But there's nothing there that says this is

20 criminal.

21     Now, they're naive, and that's no offense to them,

22 but they take the advice of their lawyer.  They pay

23 $5,000.  The lawyer says, "If you take a plea deal, it

24 will be fine."  Well, that becomes an unraveling right

25 there.  You know, that's where he's on probation and when

1   he gets revoked for that probation.  And why does he get

2   revoked?  For consensual sexual activity with a sophomore

3   when he's a senior at prom.  That has to tell you this is

4   amplified.  You know, that's something I don't know what

5   it was like in Fort Atkinson, but at Riverside High School

6   that was quite a common phenomenon.  And the idea that

7   he's been selectively prosecuted for that, that does ring

8   true.

9      I've only seen one other person for the

10   senior-sophomore sex offender.  That was Joshua

11   Van Haften.  Josh Van Haften was the only other time I've

12   seen, in all the hundreds of people I've defended, with

13   second degree sexual assault because they were a senior in

14   high school and so was the sophomore.  That's all that

15   they needed was that.

16      Now, is he noncompliant?  Clearly.  But is he

17   noncompliant in a way that we normally think of

18   noncompliance?  He's not smoking weed.  He's not drinking.

19   He's not going out, you know, breaking down mailboxes.

20   He's not getting in fights.  He's lonely and he likes

21   girls.

22      Now, I agree he should have stayed away from all

23   girls.  And believe me, talking to his parents, they tried

24   to intercede.  They're like, "You just need to take a

25   break, man.  You just need to be away from everyone."  But

1   he's online and in some ways that's sort of like the

2   no-harm zone.  We know it's a harm zone.  He now has it

3   drilled into him that's a harm zone.  But he's not having

4   this daily contact with minors.

5       So you're right, he's noncompliant in the fact that

6   he was online, he's talking to girls and he asks for

7   pictures.  But he's not noncompliant in that he's refusing

8   to work.  He's working.  He's going to school.  He's doing

9   all those other things.

10      So this really is a case where the criminal history

11  is aggravating and really it's a piling on.  I mean, you

12  see the snowball effect of you're right, we're talking

13  about a 20-year-old, a 20-year-old that is facing this

14  much time based upon these series of events.

15      I think it's more than adequately punished with five

16  years.  I think we can all rest and say that's a lot of

17  time.  That's lot of time for a young man.  That's a lot

18  of time for this crime.  It's a lot of time that we know

19  is going to change him.

20      You know, the other reason that I disagree with

21  Ms. Altman is at 40, your behavior is kind of set.  If

22  you're 40 and you're going after a 12-year-old, that's

23  weird.  And that's just -- you know, you can't do that.

24      But you're in *World of Wizard* or *Wizard 101* and

25  you're talking to a girl and you're lying about how old

1   you are and you don't have the good sense to not do it.

2   There's something less that says at 25 you're going to

3   grow out of this or you should grow out of it.  And if you

4   don't, you're going to be on supervision for the rest --

5   you know, for the next ten years after that.

6       So there's a lot that goes into this sentence that

7   you can rest assured that allowing him to be released at

8   25 should more than adequately protect the public, drive

9   the message home for him, but also provide just

10  punishment.

11      You know, this isn't somebody who had a collection of

12  child pornography.  He is part of this generation that for

13  some reason or another people send naked pictures of

14  themselves to one another.

15          THE COURT:  Well, we've had -- I mean, we have

16  over 200 nude images of the victim.

17          MR. BUGNI:  They have 140 I believe of the

18  victim, but he had 200 images of other, you know, girls

19  that -- throughout the time.  And, Judge, if I can just

20  put it into perspective.  When he's 15, the 15-year-old is

21  sending him naked photos, you know, and he's sending the

22  15-year-old naked photos.  So it's weird.  Really, man.

23          THE COURT:  I'm with you.  I'm pretty distant

24  from the phenomenon in real life, but I see a lot of it

25  here on the bench.  You know, I see people who are charged

1  with child pornography offenses.  So I just -- I have a

2  hard time understanding what the ordinary norms of social

3  media and person-to-person electronic communication in a

4  high school or among young adults would be.

5          MR. BUGNI:  I agree.  I think you've got to say

6  like we're seeing it enough and we see it from anybody

7  from Brett Favre when he's starting for the Jets --

8          THE COURT:  Don't remind me.

9          MR. BUGNI:  Yeah.  -- to Peter Jewell-Reigel.

10 Like this has sort of like -- this has become the norm.

11 It's not cool.  It's something that I think society, in a

12 hundred years, will say like "What were you doing?"  The

13 bell bottoms of the 2010s.

14         THE COURT:  I don't think I'm quite ready to say

15 it's the norm, but --

16         MR. BUGNI:  But it's happening more than it

17 really should.  That's what -- here's the main point:

18 It's not indicative of somebody who's nefarious.  It's not

19 indicative of something that's like you are now a twisted

20 individual.  You know, if there's videos of him killing

21 cats, I'd be like "Dude, no.  That's just strange."

22         THE COURT:  Well, let's explore that a little bit

23 then because I have to say, among the most disturbing --

24 in fact the single-most disturbing thing here is that, you

25 know, a lot of times I have the victim has presented

1   herself or himself as older than they really were, so

2   there's an argument that the defendant didn't know that

3   they were 14 or whatever.

4           MR. BUGNI:  Yeah.

5           THE COURT:  That's not the case here.  So we know

6   we've got somebody who has acknowledged to be 12.  Nobody

7   is trying to argue that she looked older or anything like

8   that.  There was no mistaking she was a 12-year-old and it

9   is the lewdest kind of photographs and the nastiest kind

10  of chat.  Now, she was a participant in it in that she

11  also participated in conversation that just seems

12  completely crazy rough for a 12-year-old girl.

13          MR. BUGNI:  Yes.

14          THE COURT:  Frankly, it seems kind of far out for

15  somebody who's 20.  But it's like the crudest, roughest

16  kind of chat.  It seems it would be so damaging to this

17  12-year-old girl, even if he didn't meet her, just to have

18  her early sexual experiences be of this nature.  It's

19  harmful to the victim and it's way out there.

20          MR. BUGNI:  It totally is.  Man, I've got a

21  12-year-old at home.  I totally agree with that.  And I

22  don't mean this sounds callous, but part of it is Lucy

23  Bugni is not capable of having that initial conversation

24  or at least I hope not.  But we see this.

25      We've had this in a few cases before where the

1  conversations, it's not that they're out of space and

2  they're talking about the Disney Channel and *Liv and*

3  *Maddie*.  Instead, she knows what's going on.  That's the

4  only way you can have this conversation back and forth and

5  that's the only way within -- I believe it's an hour and

6  43 minutes of initially talking that they're exchanging

7  photographs.  So I agree it's damaging, but I don't

8  believe that he's stripped her innocence.

9       And I think like when we talk about that, it's those

10  who are grooming people.  I know we had that young man who

11  posed as like a 12-year-old.  And he's like "Hey, send me

12  the photos."  Those are the guys who like "Yeah, you've

13  done some real harm here."

14       And it's not to say that because she's a little bit

15  damaged or because she was more experienced than we would

16  like a 20-year-old to be, let alone a 12-year-old, that

17  she's any less a victim, but it says the harm that's being

18  done by Mr. Jewell-Reigel is a little bit less.  And I

19  don't think that because of that the harm to her has

20  become so much greater.  I think it's just a sad fact that

21  12-year-olds now talk like this.

22       Ms. Altman and I had one case with an 11-year-old

23  that it shocked the conscience what this girl texted where

24  I was like "This can't actually happen," but yet it's

25  happening more and more.  It's not again that

1  Jewell-Reigel is on an appropriate website targeting

2  12-year-olds girls and trying to pose as it; it's that

3  he's on an age appropriate website that also draws people

4  that are under age and he didn't have the good sense to

5  follow the law and abandon as soon as she said that she

6  was not 18.

7      So I think there is a huge world of difference when

8  you're calculating your appropriate punishment and

9  redressing this crime.  You have to say again this is not

10  somebody who's trying to pretend that he's something that

11  he's not to seduce somebody who otherwise that would not

12  be.  In that way the harm is much different.

13          THE COURT:  All right.  Anything else?

14          MR. BUGNI:  Judge, let me just see in my notes.

15  I do want to say this, that there is a lot that happens

16  with the maturity between 20 and 25.  When I look back at

17  like that sophomore going into law school, that age gap

18  and the maturity that we can hope for from

19  Mr. Jewell-Reigel is not just seen in like "Here you go,

20  now he's caught and now he's going to make hopefully an

21  impassionate speech to you"; it's that he's not building

22  upon a totally flawed foundation.

23      That behavior, those criminal convictions, I think

24  they overstate both the actions that took place, but they

25  don't represent the kind of person he is.  You can see his

1    folks are here.  You can see his aunt.  You can see his

2    grades.  You can see like his involvement with the

3    trumpet, the ability to play music by ear.

4        This is somebody who I hope that a five-year sentence

5    will have that corrective action and it should allow this

6    court to take some comfort that this guy is not going to

7    become Josh Van Haften; God help us.  But this guy is

8    somebody who, hopefully in 15 years, people will say "Get

9    out of here.  You went to this prison, federal prison?

10   That's amazing.  Tell me your story," and he gives much of

11   that indicia.  There's more to him than I believe what

12   those criminal conversations bear out and what they should

13   lead you to sentence him as.

14           THE COURT:  All right.  Mr. Jewell-Reigel, you

15   don't have to say anything, but you've got the right to

16   address me before I decide on your sentence and I'd like

17   to hear from you.  So do you have anything to tell me?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  Let's talk.

20           THE DEFENDANT:  Well, I'd like to apologize,

21   start out by apologizing for my actions.  They were

22   totally unacceptable and nothing I can say or do will be

23   capable for rendering them justified.

24       I'd like to apologize also to the family that I

25   wronged.  I'd like to apologize to my family and to my

1  friends for letting them down again.  And I'd like to

2  apologize also to the justice system for wasting ample

3  opportunities presented to me to turn my life around.

4      I admit I messed up in the worst possible way and I'm

5  tired of letting my mistakes get the best of me.  I am

6  fully prepared to accept full responsibility of my actions

7  and a clear consequence is prison time.

8      And on that subject, I'd like to note that I was able

9  to watch a movie titled *Shawshank Redemption*.

10  Unfortunately, I was unable to finish it.  But from what I

11  could gather, I really admired the main actor or Andy

12  DuFresne.  I admired his demeanor, the way he kept his

13  head up, stayed strong and the way he kept himself and

14  just never really let things bother him too much.  And

15  seeing this has helped me to relax a little bit because

16  it's been really hard.  And it also reminded me that if I

17  do the same -- keep my head up and just stay strong --

18  that I can make an awesome comeback in my own way.

19      And also I'd like to mention a novel that I haven't

20  finished but, it was titled *Les Mis*.  I never pronounce

21  the full name, so please forgive me.  But the reason I

22  bring this up is because I was able to relate to the

23  character Jean Valjean when he was in his moment of

24  weakness.  He stole money from a child and he felt bad for

25  it afterwards.

1        Now, it is said in the book that the man and the

2   beast are one in the same; however, the beast will commit

3   the atrocities and the man will feel bad afterwards.  So

4   what I'm trying to say is that I would like to rid myself

5   of the beast and to become the best man yet possible.

6        And I'm honestly excited to receive the help I need

7   to turn a new leaf.  In the future I would like -- I would

8   love to show that I still have a lot of fight left in me

9   and I would love also to repay all the kindness and

10  support that has been shown to me.

11       Thank you.  That's all.

12            THE COURT:  All right.  What do you see for your

13  future; what do you want to accomplish?

14            THE DEFENDANT:  Well, as you're aware, I was

15  going to school.  I know it's going to be tough when I get

16  out, but I would still -- I'm -- just because of the way I

17  was brought up and raised, I just really feel I need to --

18  I would love to get a career.  But even if I can't, I'd

19  still -- I'm not going to give up.  I would like to get a

20  job trade or some sort of way to support myself and also

21  to support my parents when they need me.  And I just

22  don't -- what I'm trying to say is I really don't want to

23  give up.  I want to -- I don't know exactly what I'm going

24  to do, but I'm not going to just give up.

25            THE COURT:  All right.  So what led you to the

1   *Les Mis* book, because Mr. Bugni quotes that a lot.  I'm

2   wondering if he fed that to you.

3           THE DEFENDANT:  Yeah, it was actually him.

4           THE COURT:  He gave it to you, didn't he?

5           THE DEFENDANT:  He did.

6           THE COURT:  All right.

7           THE DEFENDANT:  However, I --

8           THE COURT:  He has to expand his reading list.

9           MR. BUGNI:  I just want to be clear.  I didn't

10  feed him that line; I made him read the book.

11          THE DEFENDANT:  I actually --

12          THE COURT:  We're going to get you some new

13  books.

14          THE DEFENDANT:  That would be awesome, because I

15  do -- back in history class we had to read books.  And

16  back then I'd wait for the bell to ring, go out and have

17  fun.  But now, being 20 and remembering my years in high

18  school, I actually find that I really enjoy speaking and I

19  enjoy learning things.

20      And reading *Les Mis* was actually awesome because I

21  was able to feel that the skills I've learned in high

22  school and actually be able to read even those Old

23  English.  It was really awesome to be able to still follow

24  along.  I also love *Phantom of the Opera* and I love these

25  classics.

1            THE COURT:  Okay.  It's awkward to talk about

2   these things because they're not the usual things that we

3   talk about in public, but I got to ask about your sexual

4   interests.  So like why a 12-year-old girl?

5            THE DEFENDANT:  Honestly, when we were talking,

6   it was really -- it clouded my judgment, but also just

7   being young and I guess I was more just sexually active,

8   more than I would like to be.

9            THE COURT:  It's a normal interest.  But what I'm

10  trying to get at is are you just interested in 15-year-old

11  girls and 12-year-old girls; are you interested in people

12  your own age?

13           THE DEFENDANT:  Yes.  Actually, I'm more

14  interested in people my own age.  It's just sometimes I

15  come across people who are younger, but also sexually

16  active.  But after I had gotten out from my four-month

17  jail experience, I had gotten out, I was actually with

18  people, like a relationship.  I was actually with people

19  my own age.

20           THE COURT:  I mean, because in the high school

21  context, you know, you were 18 as a senior.

22           THE DEFENDANT:  Yes.

23           THE COURT:  You ended up interested in a

24  sophomore girl.  Why not somebody in your own class or

25  somebody who is 18?

1        THE DEFENDANT:  It was -- it honestly just sort

2    of happened that way.  She was the manager of the

3    wrestling team and I was on the wrestling team and it's

4    just we talked more than I really talked with anyone that

5    was in my grade at the time.  That's just really all that

6    there was to it.  We just ended up talking more, were more

7    friendly with each other.

8        Don't get me wrong, I did talk to people in my own

9    grade.  There was just not really any connections.  But

10   had there been, I absolutely would have gone for somebody

11   that was with me.

12       THE COURT:  And so what kind of understanding

13   have you gained about your interactions with the

14   12-year-old girl that you met through the wizards game?

15       THE DEFENDANT:  I understand that I need to

16   strengthen my judgment and my just being more wise.  I

17   need to -- I understand I need to step back sometimes and

18   ask myself what am I doing, why am I doing this, what

19   kinds of consequence will this have.  Before I did not

20   think as much as for consequences.

21       THE COURT:  The other aspect of your conduct that

22   concerns me is your willingness to lie to cover things up.

23   So when you had the young lady who was hiding in the

24   closet, the police came looking for her, the parents must

25   have been out of their minds worried about her and you

1  knew where she was and you lied about the fact that you

2  had her.

3        THE DEFENDANT:  Yes.  That I would say I was

4  definitely not thinking actually about anyone other than

5  her and myself at the time.  And looking back I definitely

6  see that I had affected a lot more lives than what I was

7  thinking at the time.

8        THE COURT:  All right.  Anything else you want to

9  tell me?

10        THE DEFENDANT:  No matter what sentence I end up

11  getting, I will understand that you, from what I can see

12  just listening to you talk between prosecutor and my

13  defender, that you have good judgment.  And I just want to

14  say that no matter what you decide that I will make

15  effective use of the time that you have -- you give to me

16  to turn my life around so that we don't have this

17  conversation ever again.

18        THE COURT:  All right.  Okay.  Thank you.  I'm

19  going to take a brief recess and we'll come back and

20  finish up the sentence.

21      (Recess at 2:49 p.m. until 2:55 p.m.)

22        THE COURT:  All right.  Let me begin by thanking

23  counsel for their presentation.  And again I want to

24  express my appreciation for the way the case is

25  prosecuted.  I think it could have been much more

1  draconian.  It's a difficult case for all sorts of

2  reasons.  So let me just give you my reasons for how I

3  have settled on the sentence I'm settling on.

4       I want to say first that I am, Mr. Jewell-Reigel, I

5  am really horrified by your conduct with that 12-year-old

6  girl.  I do have the impression or believe that, as

7  Mr. Bugni says, that this wasn't her first sexual

8  experience, so I think that it's unfortunate that she

9  found herself where she was.  But instead of staying away

10  from her, you kind of took advantage of the fact that she

11  was in that kind of place where, for whatever reason at

12  the age of 12, she had embraced some really -- *adult*

13  doesn't even capture it -- attitudes about sex and

14  sexuality and you kind of took advantage of her.  She

15  probably had already been victimized by someone to have

16  that kind of ideas about sex and you took advantage of

17  that.  So I think this is really a very serious crime.

18       And I have to say and I want you to come to a

19  realization that the way your conversation went with that

20  young lady is not what healthy sexual relationships look

21  like.  That's just not how you should treat anybody in a

22  sexual relationship, let alone a 12-year-old girl, and so

23  I take this seriously.

24       And of course then you've got the images, which

25  there's nothing here to suggest that these images

1   circulated widely, but I think it's just a very dangerous

2   and destructive thing to have young people circulating

3   images of their genitals and sexual activity to people

4   they meet on the internet.  It's very unhealthy.  It's not

5   something that you should do and it's not something that

6   you should participate in.  It's very damaging to the

7   participants.

8        But I really don't think that you're an irredeemable

9   person.  I just can't -- I have to consider not only the

10  crime, but the offender.  I have to make an assessment of

11  you and your character.  And you're presented in the

12  presentence report as somebody with a history of sex

13  offenses, but I feel an obligation to really look behind

14  the fact of these convictions and the fact that you

15  violated your parole or your supervision and really try to

16  figure out really what's going on there.

17       And I have to say that I think your criminal history

18  really is -- and again I have my concerns about your

19  dishonesty with the police when you had the runaway in the

20  closet, but I think most of it I would understand as kind

21  of bad judgment that's within the ordinary range of bad

22  judgment that a teenager displays.  Maybe you were more

23  sexually active than some.

24       But I think that when I look at it, the problems that

25  I see are really your dishonesty in dealing with the girl

1   who ran away.  I think that prosecution with the victim

2   EWK [verbatim] or the battery charge, I have to say I

3   shared Mr. Bugni's view of that.  I have a hard time

4   understanding how that gets prosecuted.  That puts you on

5   supervision so that when you engage in the ill-advised

6   senior-sophomore romance that that then gets amplified

7   into a violation of your supervision and it gets you into

8   court again, whereas -- and again I'm not really endorsing

9   the idea of an 18-year-old senior dating a 15-year-old and

10  then having sex with her.  But it's still, as I said, it's

11  within the range that doesn't, to my way of thinking,

12  really make you into a dangerous sex offender.

13       So when I look at that and I see your potential --

14  obviously you've got a lot of family support, you've got

15  talents, an education that you were working on -- I really

16  don't see you as an irredeemable person; I see you as a

17  person who fundamentally has a lot to offer.

18       And so the bottom line in terms of your term of

19  incarceration, I think five years enough.  I think that

20  five years is a long sentence, particularly for somebody

21  who's 20 years old.  That must seem like a long time to

22  you.  And as horrified as I am of your conduct with a

23  12-year-old girl, I just can't think that there's a need

24  to punish you for more than five years for that action and

25  so I will impose the mandatory minimum.

1        I don't have to consider whether a lesser sentence

2    would be appropriate.  I will say, as I've said before,

3    judges hate mandatory minimum sentences because I can

4    always give five years if I need to, but I think this is a

5    case in which five years of punishment is enough.

6        And I do not at all want to diminish the seriousness

7    of the offense that you committed with the 12-year-old

8    victim.  And it's also, I note, you had other 16-year-old

9    girls that you were communicating with.  It's not okay to

10   get pictures of them naked either.  I don't know for sure

11   that you have those, but there were some pictures of some

12   other people.  You're engaged in some sort of sexual

13   communications with 16-year-olds.

14       You just have to realize that you're now an adult and

15   there is nothing wrong with being interested in sex, but

16   you have to have partners who are your equal in age.  And

17   I hope that you embrace some growing maturity and that you

18   recognize that sex is a healthy, useful thing, but not the

19   way that you've conducted it.

20       And so five years is enough.  I think that a longer

21   sentence is counterproductive to all of the interests that

22   we have here.  I think that the longer -- a sentence

23   longer than five years will actually make it more

24   difficult for Mr. Jewell-Reigel to achieve full

25   rehabilitation because he's going to spend a substantial

1  part of his important formative years incarcerated, not

2  learning how to deal with people in society.  For me to

3  extend that I think decreases the chances that he will be

4  able not only achieve the goals that he has when he gets

5  out of prison, but to make him into a healthy law-abiding

6  citizen that can have an appropriate romantic sexual

7  relationship with an adult person.  I just think it gets

8  harder the longer we keep him incarcerated and so I'm

9  going to impose the mandatory minimum of five years.

10     I'm stuck with the five years.  I think substantial

11  punishment is warranted.  But looking long term, I don't

12  think I make anybody safer by having Mr. Jewell-Reigel

13  incarcerated for a longer period than that.  I want him to

14  come back and pick up and live the life that he's

15  capable of.

16     I am going to impose a relatively long period of

17  supervised release of eight years.  I have to do at least

18  five years.  But I'm going to, as a hedge against my being

19  wrong in my judgment about Mr. Jewell-Reigel's character,

20  I'm going to impose a term of supervised release of eight

21  years.

22     And I think that eight years is an appropriate public

23  protective measure that we can take to make sure that

24  Mr. Jewell-Reigel is not engaging in the conduct that got

25  him here.  I think we can do that without having him

1   incarcerated any further than the five years, so I will

2   impose the eight years.

3       The terms are proposed and justified in the

4   presentence report and those are the ones that I'm

5   inclined to impose.  I didn't get any objections to them,

6   but let me hear from Mr. Bugni if he has any concerns or

7   objections with those conditions.

8           MR. BUGNI:  We have no objection.  We would waive

9   reading as well.

10          THE COURT:  All right.  And are they adequately

11  justified in the presentence report?

12          MR. BUGNI:  Yes, Your Honor.

13          THE COURT:  And, Ms. Altman, I think it's

14  important for the government to weigh in, too.  Do you

15  have any objections or additional conditions that you

16  would propose?

17          MS. ALTMAN:  No, Your Honor.

18          THE COURT:  Okay.  All right.  So I won't read

19  them into the record here, Mr. Jewell-Reigel.  It can

20  become tedious.  They're in writing.  They govern your

21  conduct.  Read them over carefully.  You'll have to sign

22  and acknowledge them.  And I think they're appropriate

23  here.  I've looked at them.

24      I will also say that they can be amended when you

25  begin your supervision or during your supervision if we

1    need to adjust them to consider the needs that you have at

2    the time or if more conditions or restrictions are

3    appropriate or if you want relief of some of these or

4    adjustments during your supervision, so they can be

5    changed.

6        So I will also provide, because I think the five-year

7    sentence is a long one, I will provide that the federal

8    sentence that I impose today will begin to run today.

9    You're in primary state custody.  Your sentence will begin

10   today and it will run concurrent to any sentence that you

11   receive on the -- I think the revocation proceedings are

12   the only thing you've got pending now.  Is that right?

13           MR. BUGNI:  No, because they -- it would all be

14   out of the same case number if you just put that down.

15           THE COURT:  Okay.  So are there other pending

16   charges?

17           MR. BUGNI:  Well, because you have a deferred

18   prosecution agreement, then there's a violation of the

19   deferred prosecution agreement, which gives the prosecutor

20   the decision what they want to do.

21           THE COURT:  Okay.  So I will provide that my

22   federal sentence here will run concurrent to any state

23   sentence that he would receive.

24       Okay.  Let's make sure that I've covered the

25   formalities.  I think I've covered how my sentence runs

1  with the state sentence.  I've covered supervised release.

2       The offense is not drug related.  The defendant

3  doesn't have any history of drug use.  Therefore, I will

4  waive the requirement of drug testing that would otherwise

5  be required under Title 18, United States Code, Section

6  3583(d).

7       It is adjudged that the defendant is to pay the

8  mandatory $100 criminal assessment penalty to the Clerk of

9  Court for the Western District of Wisconsin immediately

10  following the sentencing.

11       Restitution would be required if there were a request

12  for it.  But there is no request, so there is -- there

13  will be no restitution order.

14       I do find that the defendant does not have the means

15  to pay a fine under guideline section 5E1.2(c) without

16  impairing his ability to support himself upon release, so

17  I impose no fine.

18       I do find that the defendant is indigent and is

19  therefore unable to pay the $5,000 assessment under the

20  Justice For Victims of Trafficking Act of 2015, so I will

21  not impose that special assessment.

22       And I will grant the final order of forfeiture under

23  Title 18, United States Code, Section 2253 for the

24  property that was seized and subject to forfeiture.

25       The probation office is to notify local law

1    enforcement agencies and the state attorney general of the

2    defendant's release to the community.

3         And I believe that we've got Counts 2 and 3 are to be

4    dismissed.  Is that correct, Ms. Altman?

5              MS. ALTMAN:  Yes, Your Honor.

6              THE COURT:  Okay.  Counts 2 and 3 are dismissed

7    then.  And then, Mr. Jewell-Reigel, you have

8    voluntarily -- knowingly and voluntarily waived your right

9    to appeal your conviction and any sentence of imprisonment

10   that's of 240 months or less.  The sentence that I've

11   imposed is below that level, so I believe that the waiver

12   of your appeal rights would be effective.

13        Nevertheless, there is always some possibility that

14   you have some residual right to make an appeal.  If you

15   were to do that, if you had any rights to make an appeal

16   and you wanted to appeal, you have to do it subject to

17   deadlines, so I'm going to give you those deadlines.  And

18   that is, if you want to file an appeal, you must file a

19   notice of appeal within 14 days of entry of judgment or

20   within 14 days of any notice of appeal that would be filed

21   by the government.

22        If you can't afford the filing fee for an appeal, you

23   can apply for leave to appeal *in forma pauperis*, which

24   means without paying the filing fee.  And if you can't

25   afford an attorney to represent you in the appeal, you can

 1 │ apply for court-appointed counsel at government expense to

 2 │ represent you.

 3 │      I think I have covered everything, but let's check in

 4 │ and see if there's anything else I need to address here.

 5 │      Ms. Altman, anything?

 6 │          MS. ALTMAN:  Nothing for me, Your Honor.  Thank

 7 │ you.

 8 │          MR. BUGNI:  Nothing for the defense, Your Honor.

 9 │          THE COURT:  Very good.  Mr. Williams?

10 │          OFFICER WILLIAMS:  No, Your Honor.  Thank you.

11 │          THE COURT:  Very good.  Thank you all.

12 │      (Adjourned at 3:09 p.m.)

13 │                              ***

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

1          I, CHERYL A. SEEMAN, Certified Realtime and Merit

2   Reporter, in and for the State of Wisconsin, certify that

3   the foregoing is a true and accurate record of the

4   proceedings held on the 7th day of March, 2019, before

5   the Honorable James D. Peterson, Chief Judge of the

6   Western District of Wisconsin, in my presence and reduced

7   to writing in accordance with my stenographic notes made

8   at said time and place.

9   Dated this 18th day of March, 2019.

10

11

12

13

14

15                          _____
                                      /s/

16                          Cheryl A. Seeman, RMR, CRR
                            Federal Court Reporter

17

18

19

20

21

22
    The foregoing certification of this transcript does not
23  apply to any reproduction of the same by any means unless
    under the direct control and/or direction of the
24  certifying reporter.

25